## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

SHANNON SPENCER,

      Plaintiff,

v.                                  No.

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF DE BACA,
SHERIFF ELVA HARVEY, LYNITA LOVORN,
and ROBERTA D. DEES,

      Defendants.

## COMPLAINT FOR THE RECOVERY OF DAMAGES
## CAUSED BY THE DEPRIVATION OF CIVIL RIGHTS

Plaintiff brings this Complaint for damages caused by the violation of her civil and Constitutional rights. Plaintiff files this complaint under the Federal Civil Rights Act, the Americans with Disabilities Act, and the Constitution of the United States. In support of this Complaint, Plaintiff alleges the following:

### JURISDICTION AND VENUE

1. Jurisdiction over the subject matter is conferred by 28 U.S.C. § 1331 and 42 U.S.C. §§ 1983 and 1988. Venue is proper as the acts complained of occurred within De Baca County, New Mexico.

### PARTIES

2. Plaintiff, Shannon Spencer, f.k.a Shannon Sleep, is an individual and resident of Torrance County, New Mexico.

3. Plaintiff is not in custody at the time of the filing of this complaint.

4. Defendant Board of County Commissioners for the County of De Baca ("Board") is a governmental entity within the State of New Mexico and a "person" under 43 U.S.C. § 1983. At all times material to this Complaint the Board was the employer of the individual defendants.

5. Defendant Sheriff Elva Harvey (hereinafter "Harvey") at all material times was the Sheriff of De Baca County, New Mexico and is sued in her individual and official capacities.

6. Defendant Harvey was acting under the color of state law and within the course and scope of her employment at all material times.

7. Defendant Lynita Lovorn (hereinafter "Lovorn") at all material times was the administrator of the De Baca County Detention Center (hereinafter "DBCDC") and is sued in her individual and official capacities.

8. Defendant Lovorn was acting under the color of state law and within the course and scope of her employment at all material times.

9. Defendant Roberta D. Dees, a.k.a "Diann Dees" (hereinafter "Dees") at all material times was a correctional officer at DBCDC and is sued in her individual capacity only.

10. Defendant Dees was acting under the color of state law and within the course and scope of her employment at all material times.

## FACTUAL ALLEGATIONS

11. Prior to the facts alleged, Shannon Spencer was an elementary school teacher with no criminal history.

12. In 2007, Shannon was diagnosed with bi-polar disorder, a serious mental illness.

13. As a result of her mental illness, Shannon experiences episodes of mania and at times is suicidal.

14. Over time, Shannon's manic episodes prevented her from teaching.

15. By 2014, Shannon's mental health had deteriorated to a devastating degree.

16. Shannon does not have a history of abusing alcohol or using illegal drugs.

17. Over the following three years, Shannon was arrested on several occasions and incarcerated in DBCDC as a result of her increasing mental health episodes.

18. DBCDC is a small jail, located in the small town of Fort Sumner.

19. DBCDC staff knew who Shannon was and knew she was suffering from a serious mental health condition.

20. On intake at DBCDC in 2015, Shannon reported she was under a physician's care for bi-polar disorder and that she was being treated for various mental health problems.

21. Between 2015 and 2017 Shannon struggled with obtaining the correct medications for her bipolar disorder and endured severe manic episodes.

22. On February 25, 2016, Shannon was taken to the Presbyterian Emergency Room in Albuquerque after an attempted suicide.

23. On August 3, 2016, Shannon was again admitted to the hospital for suicidal ideation and remained there for 5 days.

24. In January 2017, Shannon was booked into DBCDC for a probation violation.

25. While at DBCDC, Shannon continued to suffer severe symptoms related to her mental illness.

26. On January 27, 2017, as a result of this symptomology, Shannon was sent to the psychiatric hospital in Mesilla Valley on a medical furlough.

27. After 10 days of treatment at Mesilla Valley, Shannon's symptoms had abated.

28. The psychiatrist at Mesilla Valley recommended continued individual and group counselling for Shannon along with a medication regime to control her manic symptoms.

29. After she was released from the Mesilla Valley hospital, Shannon was immediately booked back into DBCDC.

30. From February 6, 2017, through to her release on March 13, 2017, records indicate Shannon received no mental health care.

31. On September 11, 2017, Shannon was arrested for failing to obey her curfew, an alleged probation violation.

32. Shannon remained a pretrial detainee throughout her time at DBCDC while she awaited adjudication on her alleged probation violation.

33. On intake at DBCDC on September 12, 2017, Defendant Dees noted that Shannon had previously considered suicide and had previously been treated for mental health and emotional problems.

34. During the next two months while incarcerated in DBCDC, Shannon's mental health deteriorated quickly.

35. On October 11, 2017, Shannon alerted DBCDC medical staff that a recent change in medications was causing her problems.

36. On October 14, 2017, Shannon wrote a letter to Defendant Lovorn explaining that her manic behavior in the jail was a result of her psychiatric disorder and her change in medications.

37. In this letter, Shannon apologized for talking too much and explained she wanted to be helpful.

38. Around the same time, an elderly woman named Mary was booked into the facility.

39. It was obvious to Shannon and the other inmates that Mary was mentally and physically unwell.

40. Mary was confused and did not know where she was.

41. Mary had a hard time moving and would often urinate in her bed.

42. Mary would scream and yell all night long.

43. Shannon, along with other inmates, were left to bathe and clean Mary.

44. Shannon helped feed, clothe and provide "24-hour care" for Mary.

45. At times, DBCDC staff left Shannon to clean Mary's feces and urine.

46. Mary would scream and yell and appeared to be in pain all of the time.

47. While looking after Mary, Shannon's own mental health deteriorated.

48. The stress and anxiety of caring for Mary caused Shannon's bipolar disorder to intensify.

49. Shannon even told Defendant Lovorn in her October 14, 2017 letter that caring for Mary was causing her to be stressed, fatigued and act more manically than usual.

50. Inmates in the pod noticed Shannon's mental health go downhill.

51. Shannon would not stop talking.

52. DBCDC is old, run down and is no longer fit for purpose.

53. The area Shannon was housed in was in a state of decay.

54. Shannon complained frequently to staff about the filthy conditions in which she was housed, including mold in her cell and malfunctioning plumbing.

55. Shannon's mania caused her to constantly try and clean the filthy conditions she was living in.

56. Shannon would not stop complaining about the conditions in the jail.

57. Shannon wrote numerous grievances complaining of staff misconduct.

58. On October 21, 2017, Shannon wrote a grievance complaining that the conditions the women were living in were unsanitary and dangerous.

59. Shannon complained that the plumbing leaked constantly causing the pod to flood three or more times per night.

60. Shannon complained there was mold and slime from the constantly humid conditions.

61. Shannon described the conditions she was being subjected to as a "drippy torture chamber".

62. Shannon also complained that her medications were being "messed up" and untrained security staff were making medical decisions about the time and dosage of the medications she was receiving.

63. Shannon wrote directly to the Board of County Commissioners complaining about the lack of response to her grievances about the jail's unsanitary conditions.

64. Eventually, Defendant Lovorn confronted Shannon about her numerous complaints.

65. Shannon apologized to Lovorn.

66. As a result of Shannon's complaints, Defendant Lovorn had to address the issues Shannon raised with Defendant Board.

67. On October 25, 2017, Shannon complained that Detention Officer Heckathorn was looking at pictures of male genitalia on the pod computer during her shifts.

68. On at least one occasion Officer Heckathorn showed inmates pictures of a man's penis that had "penis pearls."

69. An investigation into this incident revealed that staff had a history of looking at inappropriate sexual content on the staff computer.

70. This habit existed prior to Shannon's arrival in the facility in September.

71. As a result of Shannon's complaints and manic behavior, staff began to resent her.

72. Defendant Lovorn allowed staff to retaliate against Shannon for her complaints.

73. Officer Heckathorn was allowed to be abusive and mean to Shannon.

74. Throughout November, Shannon's mental state worsened.

75. On November 22, 2017, a mental health note indicated that Shannon was becoming "less stable, which could result in a poor outcome" and recommended she see her psychiatrist for medication management.

76. Defendant Lovorn did not arrange for this psychiatric care.

77. On November 27, 2017, Shannon became actively suicidal and was placed on a 30-minute watch.

78. That afternoon staff found Shannon unconscious on her stomach with vomit around her head.

79. The following day, on November 28, 2017, Defendant Dees and Officer Heckathorn noted on their 30-minute observation sheet that Shannon tried to hang herself.

80. Later that same evening, Shannon was noted to have urinated on herself.

81. During this watch, Shannon was seen picking paint from the ceiling and eating it.

82. Throughout the next several days, Shannon was seen naked in her cell using the toilet to clean her face, urinating on herself, screaming, banging, and flooding her cell.

83. Defendant Lovorn did not arrange for psychiatric care during this period.

84. Instead, Defendant Lovorn authorized the use of OC spray in response to Shannon's behavior.

85. Shannon's behavior was clearly and obviously a function of her mental illness.

86. Not only was Shannon's mental illness obvious, all Defendants knew she had been diagnosed with bi-polar disorder.

87. On November 28, 2017, Defendant Dees taunted Shannon repeatedly.

88. Each time Shannon became upset Defendant Dees would laugh or snicker at her.

89. Rather than try to deescalate Shannon's behavior, Defendant Dees would shout and laugh at her, prompting her to become more upset.

90. Rather than seek immediate psychiatric care when Shannon was suicidal, Defendant Dees would threaten Shannon with OC spray.

91. Video of one incident shows Defendant Dees deliberately walking close to Shannon's cell bars hoping Shannon would reach through them to touch her and laughing loudly as she did so.

92. On one occasion on November 28, 2017, Shannon grabbed Defendant Dees as she walked past.

93. Once Defendant Dees pulled free, she obtained OC spray and sprayed Shannon with it.

94. On several occasions, staff noted on their observation logs that Shannon was using the water from her toilet to wash the OC from her eyes and face.

95. Defendant Harvey was made aware of Shannon's symptomology and was called to the jail on several occasions because she had a Taser.

96. Shannon's behavior became increasingly disturbed.

97. On another occasion in November, Shannon was seen vomiting and having diarrhea.

98. Later, Shannon was seen urinating on the floor and squirming face down naked in the mess.

99. Defendant Lovorn called Defendant Harvey to the facility.

100. Shannon started to bang her head on the bars of her cell.

101. Defendants Lovorn and Harvey threatened Shannon with more OC spray if she did not stop.

102. Defendants Lovorn and Harvey did not seek medical or psychiatric attention for Shannon.

103. Despite multiple attempts at suicide and the use of OC spray on multiple occasions, the Defendants did not arrange for any psychiatric care.

104. On December 2, Shannon attempted suicide again.

105. On December 4, 2017, the State filed a petition with the court stating Shannon's continuing mental health problems required specialized medical care.

106. This Petition acknowledged the jail did not have the capability of meeting Shannon's medical needs.

107. The Petition acknowledged Shannon's mental state was such that she may not be mentally competent to stand trial.

108. Shannon was ordered to be transported to the state prison which has a mental health hospital.

109. On December 4, 2017, Defendants Lovorn and Harvey transported Shannon to the Western New Mexico Correctional Facility for safe-keeping, pursuant to a court order.

110. Shannon was initially shackled with leg irons, a transport belt and handcuffs.

111. Shannon was placed behind a cage in a marked Sheriff Department SUV.

112. Shannon was still in a state of mania when she was transported.

113. Shannon could not stop talking during this transport.

114. Shannon became rude and angry and her language became increasingly harsh.

115. Law enforcement officers are trained to ignore rude comments by detainees during transport.

116. Law enforcement are trained not to respond emotionally to detainees who yell during a transport ride.

117. When they reached Santa Rosa, Defendant Harvey pulled over and yelled at Shannon to stop making rude comments.

118. As the journey continued, Shannon continued to yell and scream.

119. There was a protective cage between Shannon and Defendants Lovorn and Harvey.

120. Shannon was hand cuffed and could not make physical contact with Defendants Lovorn and Harvey.

121. In response to Shannon's foul language and manic behavior, Defendants Lovorn and Harvey decided to use OC spray on her while still in the SUV.

122. Defendant Lovorn shot OC spray into Shannon's face while she was handcuffed behind the cage in the vehicle.

123. Defendants opened the windows of the SUV so they could continue driving and not be personally affected by the OC.

124. Defendants knew OC spray needs to be washed out of person's face to stop it constantly inflicting pain and misery.

125. Defendants Harvey and Lovorn had a video camera or lapel camera in their possession during this trip.

126. The Defendants have been trained to use their cameras if force or OC spray is going to be used on a detainee.

127. Both Defendants either failed to use their cameras when they decided to squirt OC into Shannon's face, or destroyed the footage of the incident after it occurred.

128. The use of OC spray caused Shannon's screaming and yelling to intensify.

129. Due to the burning pain in her face and eyes, Shannon started to kick the cage in the SUV.

130. Defendants decided to get additional restraints from the Torrance County Sheriff.

131. Defendants did not obtain first aid care to flush Shannon's eyes.

132. Defendants used the extra restraints to cuff Shannon with her arms behind her back.

133. Defendants returned Shannon to the backseat of the vehicle fully restrained.

134. As the three-and-a-half-hour journey continued, Defendant Lovorn repeatedly sprayed OC into Shannon's face while she was restrained in the back of the vehicle.

135. Each time Defendant Lovorn did this, she opened the windows so the OC Spray would not affect Defendant Harvey while she was driving.

136. One hour and twenty minutes before the end of the journey, Defendant Lovorn turned on her lapel camera.

137. Defendant Lovorn put her camera in her pocket so it could not record video images.

138. Instead the camera was only able to pick up audio of Shannon screaming and yelling obscenities.

139. At no point in this "video" did Defendants attempt to deescalate Shannon.

140. Shannon can, however, be heard screaming when she was sprayed with OC.

141. Shannon then began to cry "I give up."

142. Shannon continued to cry and beg for help saying, "I can't take this anymore."

143. Upon information and belief, at no time did Defendants stop to administer first aid to Shannon whose face was covered in multiple bursts of OC.

144. After dropping Shannon off at the Western New Mexico Correctional Facility, Defendant Lovorn failed to turn off her camera.

145. The audio recording captured the Defendants' conversation.

146. Defendant Lovorn told Defendant Harvey, "I hope [Shannon] gets the living fucking shit beat out of her here [in prison]; I do."

147. Defendant Harvey laughed in agreement.

### COUNT 1: VIOLATION OF FOURTEENTH AMENDMENT OR, IN THE ALTERNATIVE, THE EIGHTH AMENDMENT
### (Defendant Lovorn in both her individual and official capacities and Defendant Dees)

148. Plaintiff restates each of the preceding allegations as if fully stated herein.

149. Plaintiff was at all material times awaiting adjudication for a probation violation.

150. As such, Plaintiff was at all material times a pretrial detainee.

151. Plaintiff has a right to due process under the Fourteenth Amendment.

152. In the alternative, Plaintiff has a right to be free from cruel and unusual punishment under the Eighth Amendment.

153. Plaintiff is entitled to non-punishing conditions of confinement.

154. Plaintiff is also entitled to adequate medical and mental health care while in custody.

155. Shannon was suffering from a serious and obvious medical condition.

156. Shannon's mental health deteriorated to the point where she was actively suicidal on numerous occasions.

157. Shannon was also housed in objectively punishing conditions of confinement.

158. The DBCDC is an old, dirty and squalid facility.

159. Shannon was forced to live in mold, grime and filth.

160. Shannon was forced to endure constant water leaks.

161. Shannon was also forced to look after another mentally ill inmate, Mary.

162. Shannon was not able to sleep due to the constant yelling and screaming of this inmate and the leaking conditions inside the facility.

163. Shannon had to help clean the feces and urine from this inmate.

164. As a result of these conditions, Shannon's mental health worsened.

165. This caused Shannon to exhibit behavioral symptoms associated with mania.

166. Defendants Dees would taunt Shannon when she was manic.

167. Defendant Lovorn and Dees would at times confront Shannon and escalate her manic behavior.

168. Rather than treat Shannon's mental illness with psychiatric care, Defendant Lovorn and Dees would spray her with OC.

169. After spraying her with OC, Defendants Lovorn and Dees did not arrange for medical care to wash out her eyes and mouth.

170. Because the pain from the OC was so severe, Shannon used toilet water to wash the burning chemicals from her face.

171. The use of OC spray under these circumstances was objectively unreasonable and amounted to excessive force.

172. Defendants Lovorn and Dees were aware of Shannon's serious medical condition.

173. Defendants Lovorn and Dees witnessed Shannon's suicidal behavior.

174. Defendants Lovorn and Dees saw Shannon's attempts to kill herself.

175. Defendants Lovorn and Dees were aware the jail is old, dirty and no longer fit for purpose.

176. Defendants Lovorn and Dees were aware the jail was not capable of looking after Mary's serious medical needs.

177. Rather than obtain medical or psychiatric care for inmate Mary, Defendants Lovorn and Dees relied on Shannon and the other inmates to look after her.

178. Defendants Lovorn and Dees actions amount to deliberate indifference to Shannon's constitutional rights under the Fourteenth Amendment or, alternatively, the Eighth Amendment to the United States Constitution.

179. As a pretrial detainee, Shannon was entitled to objectively reasonable conditions of confinement. *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 389 (2015).

180. The conditions Shannon was subject to, including the lack of medical care in the face of a serious and obvious mental health condition, were objectively unreasonable.

181. The deplorable conditions in the jail, combined with a failure to provide adequate mental health care, excessive force used in response to her mental health symptomology, and retaliatory punishment for her constant grievances, all had a mutually enforcing effect on Shannon that amounted to a violation of the Constitution.

182. As the final policy maker for the jail, Defendant Lovorn's personal conduct in violating Shannon's constitutional rights amounts to the official policy of the jail.

183. This policy was the moving force behind the constitutional violations described above.

184. As a direct and proximate cause of Defendants' actions, Shannon suffered damages and injuries including but not limited to physical injuries, pain and suffering, and severe psychological and emotional distress.

### COUNT 2: VIOLATION FOR PROCEDURAL DUE PROCESS
**(Defendant Lovorn in her individual and official capacities).**

185. Plaintiff restates each of the preceding allegations as if fully stated herein.

186. Plaintiff has a Fourteenth Amendment right to procedural due process.

187. During her time in DBCDC, Shannon was repetitively punished for the symptoms she displayed as a result of her mental illness.

188. This punishment included loss of privileges other inmates in the facility enjoyed.

189. As part of this punishment, Shannon was isolated in a solitary confinement cell.

190. As part of this punishment, Shannon was restricted to her cell for 24 hours per day.

191. As part of this punishment, Shannon was denied recreation and exercise opportunities.

192. Defendant Lovorn actively participated in this punishment.

193. At times, Defendant Lovorn ordered this punishment.

194. At times, Defendant Lovorn signed off on punishment arranged by her staff.

195. At no time did Shannon receive a hearing or an opportunity to defend herself from this punishment.

196. At no time did the punishment take into account Shannon's mental disability.

197. The punishment was enacted without procedural due process of any kind.

198. As administrator of the jail, Defendant Lovorn is the final policy maker for the facility.

199. Defendant Lovorn had a practice and policy of punishing people who suffer from behavioral health problems.

200. As administrator of the jail, Defendant Lovorn's individual actions became the practice and policy of the county.

201. Defendant Lovorn's individual actions were the moving force behind the violation of Shannon's procedural due process rights.

202. As a direct and proximate cause of Defendants' actions, Shannon suffered damages and injuries including but not limited to physical injuries, pain and suffering, and severe psychological and emotional distress.

**COUNT 3: VIOLATION OF THE FOURTEENTH AMENDMENT
FOR EXCESSIVE FORCE DURING THE TRANSPORT RIDE OR, IN THE
ALTERNATIVE, EIGHTH AMENDMENT FOR EXCESSIVE
FORCE DURING THE TRANSPORT RIDE.
(Defendants Lovorn and Harvey in both their official and individual capacities)**

203. Plaintiff restates each of the preceding allegations as if fully stated herein.

204. Plaintiff has a Fourteenth Amendment right to be free from excessive force.

205. As a pretrial detainee, force is excessive if it is objectively unreasonable.

206. In the alternative, under the Eighth Amendment, Plaintiff has the right to be free from excessive force that amounts to cruel and unusual punishment.

207. On December 4, 2017, Defendants Lovorn and Harvey transported Shannon to the Western New Mexico Correctional Facility for safe-keeping, pursuant to a court order.

208. During the transport, Shannon was fully restrained.

209. During the transport, Shannon was behind a protective partition in the police vehicle.

210. During the transport, Shannon presented no threat to the Defendants.

211. In response to Shannon's manic conduct and abusive language, Defendants Lovorn and Harvey decided to use OC spray while inside the vehicle.

212. Defendant Lovorn squirted OC spray into Shannon's face while she was handcuffed behind the cage in the vehicle.

213. Defendants opened the windows of the SUV so they could continue driving and not be personally affected by the OC.

214. Defendants knew OC spray needs to be washed out of person's face to stop it constantly inflicting pain and misery.

215. The use of OC spray caused Shannon's screaming and yelling to intensify.

216. Due to the burning pain in her face and eyes, Shannon started to kick the cage in the SUV.

217. As the three-hour thirty-minute journey continued, Defendant Lovorn repeatedly sprayed OC into Shannon's face while she was restrained in the back of the vehicle.

218. Each time Defendant Lovorn did this, she and Defendant Harvey opened the windows so they could continue driving.

219. The use of OC on a detainee who is handcuffed behind her back is objectively unreasonable.

220. While restrained, Shannon posed no threat to herself or Defendants.

221. Defendants used OC to punish Shannon for her verbal outbursts.

222. Defendants behaved with malice when they sprayed OC on Shannon in a moving vehicle.

223. Defendants used force in retaliation for the foul language Shannon was using.

224. Defendants willfully punished Shannon in violation of the Fourteenth Amendment, or, in the alternative, the Eighth Amendment. As a direct and proximate cause of Defendants' actions, Shannon suffered damages and injuries including but not limited to physical injuries, pain and suffering, and severe psychological and emotional distress.

### COUNT 4: VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### (Defendant Lovorn in her official capacity)

225. Plaintiff restates each of the preceding allegations as if fully stated herein.

226. Shannon is entitled to be free from discrimination under the Americans With Disabilities Act, 42 U.S.C. § 12131 et seq.

227. Defendant Lovorn knew of Shannon's mental disability.

228. Defendant Lovorn failed to accommodate Shannon's mental disability and denied her the benefits and services of the jail by reason of her mental disability.

229. Shannon was denied social interaction by reason of her mental disability.

230. Shannon was unnecessarily segregated due to her mental disability.

231. Shannon was denied reasonable standards of hygiene and medical care due to her mental disability.

232. Shannon was denied the usual services and programming offered to other inmates due to her mental disability.

233. Defendant Lovorn had a policy and practice of using inmates to look after the seriously mentally ill rather than hiring appropriate mental health staff.

234. Defendant Lovorn knew her facility was not equipped to look after the needs of mentally ill inmates.

235. Defendant Lovorn knew her staff was not trained or qualified to dispense mental health medications.

236. Despite this fact, Defendant Lovorn failed to hire the necessary mental health or medical professionals to staff the jail.

237. Instead, Defendant Lovorn relied on inmates themselves to clean, feed and clothe the mentally ill.

238. Rather than provide the necessary mental health care and medications to mentally ill inmates such as Shannon, Defendant Lovorn controlled inmate behavior through punishment, often with OC spray.

239.    When Defendant Lovorn punished Shannon for her manic behavior, she failed to accommodate Shannon's mental disability and caused her to suffer additional mental injuries.

240.    These actions amount to both discrimination and a failure to accommodate under the ADA.

241.    As a proximate and foreseeable result of Defendant Lovorn's discriminatory acts and omissions, Shannon suffered injuries including pain and suffering, emotional distress, and exacerbation of her mental illness.

## JURY DEMAND

242.    Plaintiffs hereby demand a trial by jury on all counts.

WHEREFORE, Plaintiff requests judgment as follows:

1. Compensatory damages in an as yet undetermined amount, jointly and severally against all Defendants, including damages for attorney's fees and emotional harm.

2. Punitive damages in an as yet undetermined amount severally against the individually named Defendants.

3. Reasonable costs and attorney's fees incurred in bringing this action.

4. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

COYTE LAW P.C.

/s/ Matthew E. Coyte
Matthew E. Coyte
Attorney for Plaintiff
3800 Osuna Road NE, Suite 2
Albuquerque, NM 87109
(505) 244-3030